# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **DANIEL BOTTORFF, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | Civil Action No. 18-3122 (CKK) |
| v. | ) | |
| | ) | |
| **ISLAMIC REPUBLIC OF IRAN** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................... 1

II. PROCEDURAL HISTORY ................................................................................... 3

   III. REQUEST FOR JUDICIAL NOTICE OF EVIDENCE PRESENTED IN A RELATED PROCEEDING ........................................................................................... 4

IV. LEGAL STANDARD FOR ENTRY OF DEFAULT ........................................... 6

V. STATEMENT OF FACTS .................................................................................... 7

   A. Iran's Longstanding Support of International Terrorism ............................... 7

   B. Iran's History of Malign Influence in Iraq ................................................... 9

   C. The Proliferation of IED/EFPs and IRAMs into Iraq ................................. 10

   D. Iran's History of Malign Influence in Afghanistan ..................................... 13

   E. EFP/IED/IRAM Attacks on Plaintiffs ......................................................... 16

VI. JURISDICTION ................................................................................................. 17

   A. Subject Matter Jurisdiction ......................................................................... 17

      1. The Victim Plaintiffs were subjected to attempted acts of extrajudicial killing .......... 18

      2. These acts and attempted acts of extrajudicial killing were committed with the aid of material support and resources from Iran. ................................... 19

         a. EFP attacks on Plaintiffs in Iraq were committed with the aid of material support and resources from Iran. .......................... 19

            i. The January 5th, 2010 EFP Attack on Chase Cullen ..................... 20

            ii. The July 22, 2006 EFP Attack on Adam Fargo (Deceased) ......... 20

            iii. The December 25, 2006 EFP Attack on Jae Sik Moon (Deceased) ........... 21

            iv. The December 25th, 2005 EFP Attack on Robert Reuter ............. 21

            v. The May 21st EFP Attack on Shane Smith ................................... 23

            vi.   The May, 2007 EFP Attack on Bobby Wilson, Jr. ................... 23

            vii. The October 12, 2005 EFP Attack on Nicholas L. McCoy ......... 24

            viii. The August 26, 2006 EFP Attack on Michael Fissler. ............. 25

            ix. The July 20th, 2005 EFP Attack on Dylan Hibbert. ................... 26

            x. The April 24, 2005 EFP Attack upon Nicholas McCarty. ........... 26

            xi. The April, 2006 EFP Attack on Jason Harrison. ......................... 27

         b. The November 17, 2007 rocket attack on Rustimayah Base was committed with the aid of material support and resources from Iran. ............ 28

            i. The November 17, 2007 rocket attack on Shaun Cook. ............... 28

         c. The July 2011 rocket attacks on Camp Victory were committed with the aid of material support and resources from Iran. ..................... 29

i. July 2011 rocket attack on Frieda Catherine Nicole.....................................29

d. The March 19th   2013 IED Attacks in Bagram, Afghanistan were committed with the aid of material support and resources from Iran.........................................29

i. The March 19, 2013 IED Attack on Joseph James III..................................30

e. The January 4, 2016 VBIED Attack on Camp Sullivan in Afghanistan were committed with the aid of material support and resources from Iran. ...................30

i. The January 4, 2016 VBIED attack on Randall Burns at Camp Sullivan .....32

3. *The Victim Plaintiffs all suffered personal injuries due to the EFP/IED Attacks.* ......33

B. Personal Jurisdiction ...............................................................................................33

VIII. CONCLUSION ...................................................................................................35

Plaintiffs, come before this Court seeking a finding of liability, appointment of a special master to determine damages, and the entry of default judgment against the Islamic Republic of Iran ("Iran"), and in support thereof state as follows:

## I. INTRODUCTION

After the fall of Saddam Hussein in 2003, Iran perceived the continued presence of the United States and its allies in Iraq as an existential threat to its own sovereignty. In response, as summarized from the front lines in 2006 by Lieutenant General Peter W. Chiarelli of Multinational Corps–Iraq, Iran began "pursuing a multi-faceted, interventionist policy in Iraq" with the intent to establish a pro-Iranian Iraqi government and "to either accelerate the withdrawal of Coalition Forces, or perhaps, to keep us tied up here and 'bleed us white'." The U.S. Army in the Iraq War, Vol. 1, United States Army War College Press, 573 (2019).

Therefore, Iran and its proxies introduced a weapon onto the battlefield of Iraq, the explosively formed penetrator ("EFP"). An EFP is specifically and specially engineered to pierce the armored vehicles used by the Coalition soldiers and contractors that would otherwise be relatively secure against the more crude IEDs ("Improvised Explosive Devices") commonly utilized by Iraqi insurgents. Using the EFPs manufactured and distributed by Iran, Iraq's Shia militias achieved exponentially greater lethality from their roadside attacks. Shia militias also utilized other IEDs to target U.S. soldiers and contractors.    Iran also provided material to militias operating in Iraq and to the Taliban in Afghanistan.

Amidst this lethal conflict, Decedents Adam Fargo, Jae Sik Moon; and Plaintiffs Chase Cullen, Robert Reuter, Shane Smith, Bobby Wilson Jr., Nicholas McCoy, Michael Fissler, Dylan Hibbert, Nicholas McCarty, Jason Harrison ("EFP Plaintiffs"); Shaun Cook, Frida Catherine Nichol, Joseph James III, and Randall Burns ("Other IED Plaintiffs") signed up to serve as soldiers

1

in Iraq and Afghanistan for the United States Army. The Plaintiffs and Decedents were subjected to physical and emotional trauma and/or death as the result of the detonation of an EFP/IED during the 2005–2016 timeframe ("the EFP/IED Attacks"). Plaintiffs now seek a civil judgment to compensate them for their pain, suffering, emotional distress, and economic damages. Decedents' family members seek damages for the estate and compensation for solatium damages through related claims for intentional infliction of emotional distress.

Plaintiffs have retained as an expert Mr. Ryan Thompson, who determined that there is sufficient evidence to opine that there is sufficient evidence to establish that an EFP caused the injuries of the following plaintiffs: Chase Cullin, Robert Reuter, Bobby Wilson Jr., Adam Fargo, Nicholas McCoy, Jae Sik Moon, Shane Smith, Michael Fissler, Dylan Hibbert, Nicholas McCarty, and Jason Harrison. Mr. Thompson had served 21 years in the United States Army Reserve, partly as a combatant in Iraq, Afghanistan, and Bosnia. Exhibit 1, Thompson Report, at 1. As a licensed engineer and surveyor, during the service, he worked on various engineering projects, assisting location and neutralization of IED/EFP threats, both in Iraq and Afghanistan. *Id.* at 2.

Plaintiffs have retained as an expert Mr. Phillip Smyth, who determined that there is sufficient evidence to opine that an IED or Rocket attacks were carried out by groups with the material support of Iran and injured the following plaintiffs: Shaun Cook, Frida Catherine Nicole, Joseph James III, and Randall Burns. Mr. Smyth has been researching Iran's utilization of proxy groups in the Middle East since 2006. Exhibit 2, Smyth Report at 1. He has been fellow and researchers in various Iranian proxy group related research institutions. *Id.* at 2-3. He has appeared or been quoted by numerous major news outlets on the issues above. *Id.* at 3. His works have also been widely cited in scholastic circle. *Id.* at 4. He has himself interviewed numerous Iranian proxy militia leaders, id, and testified before committees of U.S. congress on the above issues. *Id.*

Because of its longstanding support for international terrorists, including its specific and

material support of violent militias in Iraq since at least 2004, Iran has forfeited its immunity to the claims brought in this matter under the Foreign Sovereign Immunities Act ("FISA"). *See* 28 U.S.C. § 1605A. As the manufacturer, state sponsor, supplier, trainer and instigator of the EFP/IED Attacks, Iran is liable to Plaintiffs for the damages claimed in this case.

## II. PROCEDURAL HISTORY

On December 18, 2018, Plaintiffs, citizens of the United States and members of the United States military or as civilian contractors filed a complaint against the Islamic Republic of Iran ("Iran"), asserting claims for compensatory and punitive damages under § 1605A(c) of the FSIA. *Id.* Plaintiffs properly effectuated service on Iran by sending two copies (along with translations) of the summons, complaint, and notice of suit to the Secretary of State for transmission to Iran via diplomatic channels. See 28 U.S.C. § 1608(a)(4). [Dkt. 14]. To date, Iran has not responded to Plaintiffs' complaint nor has it filed any appearance before the Court in this action.

On May 18, 2020, Plaintiffs filed a Motion for Entry of Default Judgment requesting that the Court enter judgment against Iran. See Pls.' Mot., ECF No. 15-1, at ¶ 8. The Court denied Plaintiffs' motion for default judgment, without prejudice, on November 7, 2020 on the basis that plaintiffs failed to demonstrate "that an exception under the FSIA deprives Iran of its sovereign immunity in this action." *See* ECF No. 16; Memorandum Opinion and Order, at ¶ IV, page 9. Plaintiffs submit the present Motion for Default attaching expert reports and deposition transcripts and/or affidavits to establish that an exception under FSIA deprives Iran of its sovereign immunity in this action. Plaintiffs to date have been unable to obtain documents via FOIA requests to the government. At this time the experts have determined there is sufficient evidence to proceed with the claims of fourteen plaintiffs. Counsel anticipate providing a supplemental brief

with evidentiary submissions for additional plaintiffs in 90 days.[1]

## III. REQUEST FOR JUDICIAL NOTICE OF EVIDENCE PRESENTED IN A RELATED PROCEEDING

A trial court "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). This inherent power includes the ability to take judicial notice of "court records in related proceedings." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (citing *Booth v. Fletcher*, 101 F.2d 676, 679 n. 2 (D.C. Cir. 1938) ("A court may take judicial notice of, and give effect to, its own records in another but interrelated proceeding.")). Based on this principle, and in response to "the multiplicity of FSIA-related litigation in this jurisdiction, Courts in this District have thus frequently taken judicial notice of earlier, related proceedings." *Id.*

Taking judicial notice of related proceedings, however, "does not conclusively establish the facts" for purposes of the case at bar. *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010). Instead, the trial court takes judicial notice of the earlier record for the purpose of reviewing "evidence considered in the prior proceeding without necessitating the re-presentment of such evidence." *Salzman v. Islamic Republic of Iran*, No. 1:17cv2475, 2019 WL 4673761, at *3 (D.D.C. Sept. 25, 2019) (quoting *Murphy*, 740 F. Supp. 2d at 59).

In similar case, this Court received evidence concerning Iran's liability for the manufacture, distribution, and detonation of EFP devices in Iraq during the same time period at issue here. *See generally*, *Karcher v. Islamic Republic of Iran*, Case No. 1:16cv232 ("*Karcher*").[1]

---

[1] For Plaintiffs where the evidence does not support an Iranian-backed attack, Plaintiffs will submit a notice of dismissal without prejudice.

That case revolved around the use of EFP devices to attack American military personnel in Iraq. *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 14 (D.D.C. 2019). The Court held a bench trial, from December 3–6, 2018, and the plaintiffs presented a wide variety of testimony and evidence for the Court's consideration.

In the process of ultimately proving their case, the *Karcher* plaintiffs established the key finding that "identification of the weapon as an EFP *all but* necessitates the inference that Iran was responsible." *Id.* At 30 (emphasis in original). After considering plaintiff's evidence in *Karcher*, and "absent any indication that any of these EFPs was *not* backed by Iran," the Court granted their request for a default judgment. *Id.* (emphasis in original).

Plaintiffs here suggest that this Court should take judicial notice of the expert testimony presented in *Karcher*. Such an approach has already been used in this District in a post-*Karcher* case to help establish liability. In *Lee v. Islamic Republic of Iran*, the Court found that it "may rely on the evidence presented to the *Karcher* court, but must nonetheless 'reach [its] own, independent findings of fact.'" Case No. 1:19cv00830, 2021 WL 325958, at *2 (D.D.C. Feb. 1, 2021) (quoting *Rimkus*, 750 F. Supp. At 172). Relying heavily on facts submitted through judicial notice, the Court granted the EFP victims in *Lee* a default judgment as to liability. *Id.* At *15.

The present case with respect to the EFP victims closely resembles *Karcher* and *Lee*. All three matters center on Iraqi militias and their use of the same weapon, the EFP. The timeframe of the attacks—2004 to 2011—is identical. The same theory of liability is central to each case, namely that Iran manufactured, distributed, and trained (whether directly or through its agents and proxies) Iraqi militias in the use of EFP devices for the express purpose of attacking American interests. This proximity in time and place, and the similar factual and legal theories of liability, weigh strongly in favor of this Court's ability to take judicial notice of evidence presented in *Karcher*, just as the Court did in *Lee*.

5

Because the cases are closely connected, and because the evidence in *Karcher* has already been found reliable in this Court twice-over, it serves the interests of justice and judicial economy for that evidence to be considered via judicial notice rather than requiring Plaintiffs to re-present the same material. *See Salzman*, 2019 WL 4673761, at *3.

That being said, and as will be shown in detail below, Plaintiffs' case here stands independent of the *Karcher* evidence, even though it can be corroborated and supported by it. In addition to our reports, Plaintiffs respectfully suggest that this Court should take judicial notice of the following expert reports that were submitted in *Karcher*:

- Expert Report Michael Oates (*Karcher*, ECF No. 85);

- Expert Report of Michael Pregent (*Karcher*, ECF No. 86);

- Expert Report of Leo Bradley (*Karcher*, ECF No. 87);

- Expert Report of Russell McIntyre (*Karcher*, ECF No. 88);

- Expert Report of D. Wade Barker (*Karcher*, ECF No. 89);

- Expert Report of Kevin Lutz (*Karcher*, ECF No. 90).

## IV. LEGAL STANDARD FOR ENTRY OF DEFAULT

"Under the FSIA, a court cannot simply enter default judgment; rather, out of respect for the principle of sovereign immunity, it must ensure that the plaintiffs have established their claim or right to relief by evidence that is satisfactory to the court." *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 236 (D.D.C. 2012); *see also* 28 U.S.C. 1608I. This standard is identical to the standard for entry of default judgment against the United States under Fed. R. Civ. P. 55(d). *See Hall v. Republic of Iraq*, 328 F. 3d 680, 683–84 (D.C. Cir. 2003).

"When the Defendant State fails to appear and the plaintiff seeks a default judgment, the FSIA leaves it to the court to determine precisely how much and what kinds of evidence the

plaintiff must provide." *Han Kim v. Democratic People's Republic of Korea*, 774 F. 3d 1044, 1047 (D.C. Cir. 2014); *see also Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012) (via sworn affidavits); *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 109 n.6 (D.D.C. 2005) (by taking "judicial notice of related proceedings and records"); *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 78 (D.D.C. 2006) (with or without a live evidentiary hearing). In sum, evidence "satisfactory to the Court," 28 U.S.C. 1608I, may be provided at an evidentiary hearing, but it can also consist of "sworn affidavits or declarations, prior judicial fact-findings, and other documents submitted in accordance with the Federal Rules of Evidence." *Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 242 (D.D.C. 2020).

In weighing the evidence, the trial court must consider Congress's stated purpose in enacting § 1605A—to "compensate the victims of terrorism [so as to] punish foreign states who have committed or sponsored such acts and [to] deter them from doing so in the future," *Kim*, 774 F. 3d at 1408 (citation omitted)—while simultaneously recognizing the difficulty in obtaining "firsthand evidence and eyewitness testimony … from an absent and likely hostile sovereign," *Owens v. Republic of Sudan*, 864 F. 3d 751, 785 (D.C. Cir. 2017). Although "[t]he Court must scrutinize the plaintiff's allegations," *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 17 (D.D.C. 2016), it should also "accept as true the plaintiffs' uncontroverted evidence," *see Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000); *see also Bennett v. Islamic Republic of Iran*, 507 F. Supp. 2d 117, 125 (D.D.C. 2007), "including proof by affidavit," *Wachsman ex rel. Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 155 (D.D.C. 2009).[2]

## V. STATEMENT OF FACTS

## A. Iran's Longstanding Support of International Terrorism

Since the Iranian revolution in 1979, Iran has supported terrorist organizations and international acts of terrorism as an instrument of its stated foreign policy goals. *Karcher*, ECF No. 85 at 12. As a result of this widespread support for terrorist groups such as the Lebanese Hezbollah ("Hezbollah"), the State Department formally designated Iran as a state sponsor of terrorism in 1980s. *see* 49 Fed. Reg. 2836 (Jan. 23, 1984); *Est. of McCarty v. Islamic Republic of Iran*, Case No. 1:19cv853, 2020 WL 7696062, at *3 (D.D.C. Dec. 28, 2020) ("Iran committed substantial support to fund Hezbollah's acts of 'terrorism as an official means of forwarding foreign policy' in the early 1980s").

Iran's support for terrorism is largely carried out under the umbrella of the Islamic Revolutionary Guard Corp ("IRGC"), a paramilitary organization that answers directly to the Supreme Leader of Iran. *Karcher*, ECF No. 88 at 5. The IRGC was designated as a Foreign Terrorist Organization in April 2019, in large part due to its active role in providing EFP devices to Iraqi militias.

Within the IRGC is a specialized branch known as the Qods Force ("IRGC-QF"). The IRGC-QF is primarily focused on foreign operations and has a long and well-documented history of supporting terrorism on behalf of Iran. In recognition of this malign behavior, the U.S. Department of Treasury designated the IRGC-QF as a Specially Designated Global Terrorist in October 2007. *Karcher*, ECF No. 88 at 4 n.1, 5 n.3.

Iran, through the IRGC and the IRGC-QF, has groomed Hezbollah as its premier proxy militia in the region. *See Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85, 93 (D.D.C. 2019). Iran has historically provided Hezbollah with annual financial support, growing in recent years to be estimated as high as $1 billion, *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 60 (D.D.C. 2018) (citing expert opinion of Dr. Levitt). In exchange, Hezbollah often aides Iran in the execution of complex attacks and the creation and/or training of additional proxy militias. *Karcher*, ECF No.

88 at 8–9.

Leveraging its successful longstanding relationship with Hezbollah, Iran has repeatedly attempted to replicate this type of proxy relationship in the Middle East, including in Iraq. Exhibit 2, Smyth Report, at 4-11.

### B. Iran's History of Malign Influence in Iraq

Iran has a long and tense history with its Iraqi neighbors. During the reign of Saddam Hussein, the two countries engaged in a protracted war, resulting in the exile of many Shia Iraqis into Iran. *Id.* As part of its conflict with Iraq, Iran molded these Shia exiles into a fighting force known as the Badr Corps.; *Karcher*, ECF No. 88 at 15. After the Coalition invasion and the fall of Saddam in 2003, Iran quickly dispatched the Badr Corps into Iraq, serving as a *de facto* arm of the IRGC that was integrated into the rebuilt Iraqi security forces. *Karcher*, ECF No. 85 at 15; *Karcher*, ECF No. 88 at 16.

In addition to the Badr Corps, Iran supported an insurgency threat to the Coalition named Jaysh al-Mahdi ("JAM"), a nationalist militia established by Shia cleric Muqtada al-Sadr for the purpose of resisting what it perceived as the continued occupation of Iraq by foreign forces. *Karcher*, ECF No. 85 at 17–18. Iran, in an effort to further its influence within Iraq and increase its ability to strike Coalition forces, used its relationship with al-Sadr to become an early benefactor of JAM. *Id.*; *see Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 40 (D.D.C. 2019).

In the first several years after the invasion, Iran consistently provided both the Badr Corps and JAM with money, weapons, training, and advice for the specific purpose of undermining the reconstruction efforts. As the years passed, Iran refocused its efforts in Iraq by handpicking leaders and elite talent from the ranks of the Badr Corps and JAM to lead new, more directly controlled, elite militia groups. *Karcher*, ECF No. 88 at 39–47. Those new groups included, among others, Kata'ib Hezbollah and Asa'ib Ahl al-Haq. Exhibit 2, Smyth Report. at 6-7.

Between 2004 and 2011, Iran provided advanced weapons, including EFP devices and components, financial support, and military training to all of its proxies in Iraq. These efforts were supported and carried out by Hezbollah, with training camps hosted both within Iran and in Lebanon. *Karcher*, ECF No. 88 at 66–67. This support was so material and expansive that substantial percentages of United States military casualties could be tied to known IRGC-QF proxy organizations. *Karcher*, ECF No. 85 at 29 (quoting Major General Lynch, explaining "that the technology and the financing and the training of the [EFPs] are coming from Iran"). In sum, "the Iranian regime was content to fund, train, and supply all parties willing to attack the U.S.-led coalition." The U.S. Army in the Iraq War, Vol. 2, United States Army War College Press, 66 (2019)

## C. The Proliferation of IED/EFPs and IRAMs into Iraq

The Improvised Explosive Device (IED) is a weapon system that has been around long before the dawn of dynamite. While the Department of Homeland Security described the weapon as a "'Homemade bomb' and/or destructive device,"[2] Iran has supplied many of its proxy forces with an industrialized ability to build and deploy IEDs. This coincides with training regimens for these proxies to more effectively used these systems. Iranian-backed groups in Lebanon (Lebanese Hizballah) and Iraq (Asa'ib Ahl al-Haq, the Badr Organization, Kata'ib Hizballah, Kata'ib Sayyid al-Shuhada, and others) have pioneered the industrial use of IEDs, particularly buried varieties to target Western foes.[3] These buried IEDs have continued to be used by Iranian front groups in Iraq against logistical vehicles supplying U.S. troops.

---

[2] "IED Attack Improvised Explosive Devices," News & Terrorism: Communicating in a Crisis, Department of Homeland Security, https://www.dhs.gov/xlibrary/assets/prep_ied_fact_sheet.pdf.

[3] Nicholas Blanford, Warriors of God: Inside Hezbollah's Thirty-Year Struggle Against Israel, (New York: Random House, 2011) P. 444. Matti Friedman, Pumpkinflowers: A Soldier's Story of a Forgotten War, Chapel Hill: Algonquin Books, 2017), P. 132. See also: Samuel M. Katz, The Ghost Warriors: Inside Israel's Undercover War Against Suicide Terrorism, (New York: Random House, 2016). In Katz's book, he discusses Lebanese Hizballah's master-level skills in training other proxies of Iran in the use of IED technology and camouflage techniques.

A development on the IED has been the Explosively Formed Penetrator or EFP. The EFP often uses an explosion caused by an IED to turn a piece of metal (often copper) over the IED into a molten metallic projectile that can penetrate. The Iran-Hezbollah partnership is intimately connected to the history of the EFP. The high level of Iranian involvement in EFP development and deployment in Iraq led the Washington Post to headline one article with "Soleimani's legacy," a reference to slain IRGC-QF commander Qasim Soleimani, "The gruesome, high-tech IEDs that haunted U.S. troops in Iraq." Smyth Decl. at 9-10. The first recorded EFP attack took place on October 5, 1998 in Lebanon. *Karcher*, ECF No. 88 at 13.

Hezbollah and Iran, in partnership, began distributing EFP devices to Iran's proxies in Iraq in 2004. *Karcher*, ECF No. 85 at 25 n.51 (quoting State Department – Country Reports on Terrorism 2006); *Karcher*, ECF No. 88 at 27. The initial instances of EFP attacks in Iraq were immediately associated with the Hezbollah design and Iranian support. *Karcher*, ECF No. 88 at 55 (quoting "the Chilcot Report").

Concurrently with the supply of these weapons, Iran arranged for the training of large numbers of militia members in the appropriate assembly and use of EFP devices – a necessary component for the devices to be effective. *Karcher*, ECF No. 90 at 19–21. Late in 2004, British intelligence reports concluded that rapid advancements in EFP technology focused in Shia-controlled areas of Iraq "could only have been achieved through focused external assistance." *Karcher*, ECF No. 88 at 67. Eventually, detainee interrogations showed how EFP-specific trainings were hosted by Hezbollah inside Iran for those militia members that showed the required aptitude. *Id.* At 70–71. Before long, "EFPs became 'the signature weapon of Iranian-supported Special Groups.'" *Karcher*, ECF No. 87 at 19 (quoting Gen. David Petraeus, MNF-I Commander's Weekly Assessment, April 14-20, 2008, at 37).

The Iranian supply of EFP devices and their components into Iraq was repeatedly

confirmed by the discovery of various caches and stockpiles by Coalition forces. *Karcher*, ECF No. 87 at 19; *Karcher*, ECF No. 88 at 29–30, 59; *Karcher*, ECF No. 90 at 16–19. Military investigators often determined that particular EFP components originated and/or were manufactured in Iran. *Id.* By contrast, when Iraqi militias did attempt to manufacture their own EFP devices locally or using locally made components, they were easily identifiable because of their poor quality, especially with the milling of the copper plates, impacting the effectiveness of the weapons. *Karcher*, ECF No. 90 at 21. Ultimately, however, even if an Iraqi militia did manage to produce an effective EFP device, it would a) be based on the same design introduced by Iran and Hezbollah, *id.* At ¶ 29, and b) require the use of high- energy explosives,[3] which were only available to the militias thanks to Iran's provision and sponsorship, *Karcher*, ECF No. 90 at 23.

Finally, Iran's provision of equipment and its ongoing involvement in the execution of EFP attacks is also borne out by inspecting the triggering mechanisms. Although it is possible to do so via a direct command wire, many EFP devices in Iraq were armed using remote frequency transmitters and then triggered by a passive infra-red device which would detonate when it sensed the heat signature of a vehicle's engine. *Karcher*, ECF No. 85 at 25–26. Such sophisticated adaptation would not have been possible without the active involvement and oversight of the IRGC and Hezbollah. *Karcher*, ECF No. 85 at 33 (adaptability "was a direct result of training and intelligence assessments provided by Hezbollah under the IRGC-QF's auspices").

In sum, the militia groups in Iraq would not have developed the capabilities to manufacture or obtain EFPs without the material support and resources of Iran. The training provided by Iran substantially increased the lethality and effectiveness of the EFP devices it supplied. *Karcher*, ECF No. 90 at 74 ("without the direct and active assistance and direction of the IRGC and Hezbollah, indigenous Shi'a terror cells would not have been nearly as effective and lethal in attacking U.S. military armor in Iraq during the relevant period"). Ultimately, Iran's

purpose in funneling EFP devices into Iraq and providing the accompanying training was "to inflict pain on the United States." *Karcher*, ECF No. 87 at 17.

The Improvised Rocket Assisted Munition or IRAM has been another tool heavily utilized by Iranian proxies in Iraq. Exhibit 2, Smyth Report at 10-11. Iran has specialized in supplying these weapons systems to proxy groups in Iraq including Jaysh al-Mahdi, Kata'ib Hizballah, and Asa'ib Ahl al-Haq.    *Id.*

**D. Iran's History of Malign Influence in Afghanistan**

Although Iran is a Shia Muslim nation and the Taliban is a Sunni Muslim organization, this has not prevented them from conspiring together in pursuit of violent anti-American activities. Ex. 2 (Exhibit A to Smyth Report at ¶ 61); *see also* U.S. Department of Defense, Annual Report on Military Power of Iran (Apr. 2012) (even though "Tehran's support to the Taliban is inconsistent with their historic enmity, it complements Iran's strategy of backing many groups to maximize its influence while also undermining U.S. and [NATO] objectives by fomenting violence"). Iran supports the Taliban not for ideological reasons, but as part of its regional strategy to oppose the presence of the United States in the Middle East through increased American cost and casualties. Ex. 2 (Exhibit A to Smyth Report at ¶ 63) Although the Taliban and Iran often differ on their ultimate goals and motives, the shared strategy of attacking American interests has consistently brought them together, particularly once the United States invaded Afghanistan following 9/11. *Id.* at ¶ 59.

As early as February 2002, the United States government had already recognized a turn in Iran's motivations in the Afghanistan theater as reflected in the CIA Director's testimony before Congress:

> The initial signs of Tehran's cooperation and common cause with us in Afghanistan are being eclipsed by Iranian efforts to undermine US influence there. While Iran's officials express a shared interest in a stable government in Afghanistan, its security forces appear bent on

13

countering the US presence. This seeming contradiction in behavior reflects deep-seated suspicions among Tehran's clerics that the United States is committed to encircling and overthrowing them-a fear that could quickly erupt in attacks against our interests.

Testimony of Hon. George J. Tenet, Current and Projected National Security Threats to the United States, S. Hrg. 107-597 (Feb. 6, 2002). During this same period, Iran accelerated its pattern of providing material support to proxy militia groups throughout the Middle East, enabling them to inflict damage on Iran's enemies without the need for direct Iranian involvement. Ex. 2 (Exhibit A to Smyth Report at ¶ 24). The Mahdi Army, Hamas, and Lebanese Hizballah are three high profile examples. *See id.* at ¶¶ 25–26, 35–37. As a natural extension of this strategy, Iran applied the same proxy model to the Taliban in Afghanistan. *Id.* at ¶ 38. As one Taliban commander put it: "Our religions and histories are different, but the goal is the same. We both want to kill Americans." Miles Amoore, *Iranian military teaches Taliban fighters the art of ambush*, The Sunday Times, Mar. 21, 2010.

According to the United States Department of State, "[s]ince 2006, Iran has arranged arms shipments to select Taliban members, including small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, and plastic explosives." Ex. 2 (Exhibit A to Smyth Report at ¶   27 (citing United States Department of State, Country Reports on Terrorism, 2012, p. 196). A variety of government findings and open source reporting supports this conclusion. *See, e.g., id.* at ¶ 26.

By 2007 and 2008, concrete evidence of Iranian weapons transfers to the Taliban began to surface. *See, e.g., id.* at ¶¶ 26–29. In 2009, U.S. Army General Stanley McChrystal referred to Iran's role in Afghanistan as "ambiguous . . . providing developmental assistance and political support to [the Afghan government] while the [IRGC-QF] is reportedly training fighters for certain Taliban groups and providing other forms of military assistance to insurgents." Stanley A. McChrystal, COMISAF'S Initial Assessment, Secretary of Defense Memorandum June 2009,

Initial United States Forces – Afghanistan (USFOR-A) Assessment (Aug. 30, 2009). General McChrystal correctly forecasted that "Iran has the capability to threaten the mission in the future." *Id.* Iran's provision of advance explosives during this timeframe was "[a]n important turning point [in the war between the U.S. and the Taliban]." Ex. 1 at ¶ 28 (citing Antonio Giustozzi, The Taliban At War: 2001–2018, Oxford University Press, (2019), p. 141).

In addition to weapons and military training, Iran also provided material support to the Taliban through financial assistance and motivation. Most directly, Iran has maintained a bounty system for Taliban fighters through which it paid "$1,000 per killed U.S. serviceman and $6,000 for each destroyed U.S. vehicle." *Id.* at ¶ 55. These financial incentives provided both capability and motivation for attacks against Americans. *Id.* at ¶ 56.

Iran also provides substantial financial benefits to the Taliban through its state sanctioned enabling of the narcotics trade. The Taliban has an annual budget running between $400 million and $1 billion, a large portion of which is obtained through drug cultivation and distribution. *Id.* at ¶ 49. An Iranian general within the IRGC-QF, acting in his official capacity, was sanctioned by the United States government for allowing "Afghan narcotics traffickers to smuggle opiates through Iran in return for assistance." U.S. Department of the Treasury, Treasury Designates Iranian Qods Force General Overseeing Afghan Heroin Trafficking Through Iran, March 7, 2012; see also Ex. 2 (Exhibit A to Smyth Report at ¶ 6).. Such "assistance" included smuggling "weapons to the Taliban" on behalf of the IRGC-QF. Id.

Senior Iranian military officers have been implicated in a variety of schemes to provide material support and resources to the Taliban. On August 3, 2010, the Treasury Department designated IRGC-QF General Hossein Musavi and Colonel Hasan Mortezavi for their roles in providing "financial and material support to the Taliban." United States Department of the

Treasury, Fact Sheet: U.S. Treasury Department Targets Iran's Support for Terrorism Treasury Announces New Sanctions Against Iran's Islamic Revolutionary Guard Corps-Qods Force Leadership (Aug. 3, 2010). In February 2014, the Treasury Department designated two more IRGC-QF officers, Alireza Hemmati and Akbar Seyed Alhosseini, for their role in "funneling Iranian assistance to the Taliban" and providing "logistical support" towards the planning and executing terrorist attacks. Ex. 2 (Exhibit A to Smyth Report at ¶ 27) (citing United States Department of the Treasury, Treasury Targets Networks Linked to Iran, (Feb. 6, 2014)).

Following the Camp Sullivan Attack, Iran's material support for the Taliban has continued. On October 23, 2018, the Treasury Department announced the designation of eight individuals pursuant to Executive Order 13224 as a result of an international effort to curb Iran's illicit support for the Taliban. See United States Department of the Treasury, Treasury and the Terrorist Financing Targeting Center Partners Sanction Taliban Facilitators and their Iranian Supporters (Oct. 23, 2018). These men included Mohammad Ebrahim Owhadi, an IRGC-QF officer that reached an agreement in 2017 with a Taliban governor, Esma'il Razavi, who acted "for or on behalf of IRGC-QF and for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, the Taliban," and Abdullah Samad Faroqui, the Taliban governor who conspired with Owhadi to further the training and support relationship between the Taliban and Iran. *Id.*

In June 2015, approximately six months before the Camp Sullivan Attack, a Taliban commander stated that "Iran supplies us with whatever we need."

**E. EFP/IED/IRAM Attacks on Plaintiffs**

The Plaintiffs have provided first-hand information and other admissible evidence to establish certain foundational facts about each of the attacks at issue here. Later in this

Memorandum, those facts and the accompanying photographic evidence will be discussed in light of the conclusions drawn by Plaintiffs' retained experts concerning Iran's support for these attacks. For such discussion, See Section VI.A.2 of this Memorandum.

## VI. JURISDICTION

### A. Subject Matter Jurisdiction

A federal district court has subject matter jurisdiction over "any nonjury civil action against a foreign state," so long as one of the FSIA's enumerated exceptions to sovereign immunity apply. *See* 28 USC § 1330(a). In this case, Iran is subject to suit under the FSIA's terrorism exception to sovereign immunity, *see* 28 U.S.C. § 1605A, which confers jurisdiction against a foreign government if: (1) the claim is against a designated "State Sponsor of Terrorism"; (2) the victims are nationals or employees of the United States; and (3) money damages are sought for personal injury or death caused by an act of torture, extrajudicial killing, or hostage taking, or the material support of such acts. 28 USC § 1605A(a)(1)–(2). [4]

The first two elements are straight-forward.

The Court may take judicial notice of Iran's status as a designated State Sponsor of Terrorism, both at the present time, and when the cause of action arose. *See, e.g.*, *Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85, 100 (D.D.C. 2019) (citing 49 Fed. Reg. 2836–02 (Jan. 23, 1984), and U.S. Dep't of State, State Sponsors of Terrorism, *available at* https://www.state.gov/j/ct/list/c14151.htm).

Plaintiffs are U.S. nationals and/or members of the U.S. military or family members of the deceased, therefore satisfying the second element.

---

[4]  Section 1605A(a)(2) also requires the claimant to offer the foreign state an opportunity to arbitrate the claim if the act occurred within the foreign state against which the claim is brought. Such an offer of arbitration is not required in this case because the actions did not take place within Iran.

Plaintiffs can satisfy the third element by showing evidence of: a) an act of attempted extrajudicial killing against each victim; (b) committed with the aid of material support from Iran; and (c) that resulted in personal injuries to the Victim Plaintiffs.

**1. The Victim Plaintiffs were subjected to attempted acts of extrajudicial killing.**

The FSIA's terrorism exception defines an extra-judicial killing by reference to the Torture Victim Protection Act of 1991 ("TVPA"). *See* 28 U.S.C. § 1605A(h)(7). Accordingly, the TVPA provides that an "extra-judicial killing" is "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Pub. L. No. 102-256, § 3(a), 106 Stat. 73.

Although the text of this statutory provision does not directly address attempted acts, given the FSIA's stated purpose, any "ambiguities [should be interpreted] flexibly and capaciously." *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017) (quoting *Van Beneden v. Al-Sanusi*, 709 F.3d 1165, 1167 n.4 (D.C. Cir. 2013). Consistent with the statute's purpose, the definition of "extra-judicial killing" within the TVPA has been interpreted to "allow[] plaintiffs to assert liability for a defendant's attempted extrajudicial killing, even if no one died as a result of that attempt." *Id.* (citing *Warfaa v. Ali*, 33 F. Supp. 3d 653, 666 (E.D. Va. 2014); *Doe v. Constant*, No. 04cv10108, 2006 WL 3490503 at 9 n.3 (S.D.N.Y. Oct. 24, 2006)). Therefore, in this statutory context, "deliberated" attempts to kill, regardless of whether they actually result in deaths, "fall within the scope of Section 1605A(a)(1)." *Karcher*, 396 F. Supp. 3d at 58.

Here, as in *Karcher*, each of the Plaintiffs were subjected to either a successful or attempted extrajudicial killing by means of specially designed roadside explosives known as EFPs and other IEDs. As discussed in detail throughout this memorandum, an EFP is specially engineered for the purpose of piercing armored vehicles. Any individual using an EFP, or any entity distributing such weapons, necessarily possesses the intent to kill the intended targets.

**2. These acts and attempted acts of extrajudicial killing were committed with the aid of material support and resources from Iran.**

The relevant definition of "material support or resources" is "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel … , and transportation, except medicine or religious materials." *Hamen*, 401 F. Supp. 3d at 103 (quoting 18 U.S.C. § 2339A(b)(1)).   The act of supplying a weapon that is later used in a terrorist attack is a classic example of material support, so long as that act was completed "by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." *Karcher*, 396 F. Supp. At 55 (quoting 28 U.S.C. § 1605A(a)(1)).

**a. EFP attacks on Plaintiffs in Iraq were committed with the aid of material support and resources from Iran.**

Here, the IRGC and the IRGC-QF serve as agents of Iran while arranging for the manufacture and distribution of EFPs into Iraq. *Id.* Moreover, the design and nature of EFP devices themselves supports the proposition that Iran intended for these weapons to be used to kill. *Id.* At 56 (because of "this deadly weapon's design, its delivery to Shi'a militia proxies, and its effective deployment against U.S. military vehicles, the Court finds that the intended extrajudicial killings were deliberate").

Relying on the same type of evidence as what is presented here, the Court in *Karcher* found that "identification of the weapon as an EFP *all but* necessitates the inference that Iran was responsible." *Id.,* at 30. (emphasis in original). By the same vein, "absent any indication that any of these EFPs was *not* backed by Iran," this Court should hold Iran responsible for the provision of material support and resources towards each of the EFP Attacks. *Id.* (emphasis in original).

Following are summaries of the EFP attacks suffered by Plaintiffs' and summary of the expert's conclusion.

### i. The January 5th, 2010 EFP Attack on Chase Cullen

Chase Cullen was a Sargent in Bravo Troop, 1st Brigade, 1st Calvary Division who served four tours in Iraq.   Exhibit 3, Cullen Dep. at 4-5. On 5th January, 2010, Mr. Cullen was part of the three-vehicles convoy patrolling near Kisiniyah, Iraq. *Id.* at 6-10. Passing through a choke point, the lead vehicle was struck by an explosive device which was set up in a mound of dirt.   *Id.* at 14-15.   The struck vehicle had a fist size puncture entering the driver side door and exiting the passage door.   *Id.* at 11-13. Mr. Cullen had experience identifying EFPs and EOD personnel determined the event to be a "triple array" EFP attack and found cooper and steel shrapnel within the vehicle. *Id.* According to the expert opinion, damage, location, and date of the attacks were consistent with EFP strike.   Exhibit 1, Thompson Report at 3. Copper and steel shrapnel was excavated in the post-blast analysis. Plaintiffs' expert believes that detonation was through a Passive Infrared (PIR) sensor, pressure plate, or trip wire. *Id.*

As a result of the blast, Mr. Cullen was knocked unconscious, continues to suffer from a traumatic brain injury, and has been treated for PTSD. Exhibit 3, Cullen Depo, at 10, 21-22.

### ii. The July 22, 2006 EFP Attack on Adam Fargo (Deceased)

Adam Fargo was a Medic serving with the 4th Brigade, 101st Airborne in Iraq.   Exhibit 4, Doug Fargo Dep. at 6. On 21st or 2nd July of 2006, Mr. Fargo was patrolling Sadr City for route clearance. *Id.* at 10-13. While maneuvering through some bridge abutments, a remotely controlled IED attack struck the second or third vehicle in convoy. *Id.* Sergeant Fargo was fatally wounded, while driving the vehicle during the time of the explosion.    *Id.* Father of the deceased, Mr. Doug Fargo, was debriefed by the Army that the son was attacked with "advanced IED" with

20

armor piercing capabilities. *Id.* at 16. Plaintiffs' expert found this attack, based on the evidence and the Army's briefing, to be consistent with the EFP characteristics. Exhibit 1, Thompson Report, at 9-10.   This attack was confirmed by U.S. Central Command to be a "Directional IED" which is terminology for an EFP. *Id.*

Mr. Fargo was killed by to the explosion.[5]   This suit is brought by his father, Douglas Fargo individually and on behalf of the estate.   Dkt. No. 1.

### iii. The December 25, 2006 EFP Attack on Jae Sik Moon (Deceased)

On December 25, 2006, during a convoy in the vicinity of Baghdad, an IED explosion detonated, wounding three and killing SSG Jae Sik Moon. Exhbit 1, Thompson Report, at 13. From records reviewed of the incident, the EOD team evaluating the strike concluded that the device was a steel lined EFP with copper discs. *Id.* Plaintiffs' expert found this attack, based on the evidence and the EOD's briefing, to be consistent with the EFP characteristics. *Id.* This attack is listed by U.S. Central Common as a confirmed Directional IED which is terminology for an EFP. Id.

SSG Moon was killed due to the explosion.[6]   This actions is brought by his father Young Moon, and mother Ki Moon.

### iv. The December 25th, 2005 EFP Attack on Robert Reuter

Robert Reuter was a Combat Medic for 619th Ground Ambulance Unit in the U.S. Army. Exhibit 5, Reuter Dep. at 4. On 25th December, 2005, during convoy operations returning from a multi-destination mission between FOB Speicher, Kirkut, and Balad, the lead vehicle was struck from the right of the direction of travel by an explosive device which was disguised behind a

---

[5] https://www.findagrave.com/memorial/15014769/adam-joseph-fargo
[6] https://www.findagrave.com/memorial/17174023/jae-s.-moon

painted piece of Styrofoam on a brick wall. *Id.* at 7-11. The explosion created a hold through the engine block of the up-armored Humvee and melted the interior of the engine compartment. *Id.* Bits of shrapnel splayed off from the device and injured all of the occupants of the vehicle. *Id.* The front end of the vehicle was destroyed. *Id.* Additionally, the front of the vehicle was in flames as a result of the heat of the explosion. *Id.* The bomb techs informed Mr. Reuter that the bomb was an EFP. *Id.*

On 6th February, 2006, during convoy operations between Kirkut and Balad, the lead vehicle was struck from the left of the direction of travel by an explosive device. *Id.* at 16-23. The explosion created a hole through the engine block of the vehicle and melted the interior of the engine compartment. *Id.*   The front end of the vehicle was destroyed and the bond techs informed him it was an EFP. *Id.*

Both events have multiple consistencies with Techniques, Tactics, and Procedures known to be used by insurgents in that area and at that time. These consistencies include the following:

1. Initiation by Passive Infrared (PIR) sensor or remote control (Garage door remote)

2. Placement along the side of the road and hidden in painted Styrofoam or hidden in rock walls.

3. Excessive heat from the blast causing a fire in the struck vehicle and melting of interior components.

4. Large diameter hole (approximately 8" to 12") at point of impact.

5. Smaller splayed shrapnel holes surrounding the larger hole.

6. Striking of the first vehicle in the convoy indicates that the vehicle triggered the strike, and it was not command detonated.

Exhibit 1, Thompson Report at 5-6.

The consistency of the two events so close together geographically and within a few months of each other indicate that these two devices were likely built and emplaced by the same EFP cell. *Id.*

Mr. Reuter suffered from knee injury from the first blast, requiring him to go through multiple surgeries. Exhibit 5, Reuter Dep. at 16. He also received surgery on shoulder. *Id.* He also suffers from blurred vision and recurring migraine. Id. at 15.   He currently suffers from   PTSD as a result of the blasts. *Id.* at 16.

**v. The May 21st EFP Attack on Shane Smith**

Shane Smith was an Infantry Sergeant while serving in the 25th Infantry in the U.S. Army in 2010.   Exhibit 6, Smith Dep. at 4. On 21st of May 2007, while conducting a raid on a known enemy compound, the vehicle SSG Smith was occupying was struck by an EFP on the ingress road into the compound. *Id.* at 6-10. SSG Smith was the TC (truck commander) for the vehicle he was in, and there was a driver, a gunner, and two passengers. *Id.* The vehicle was struck on the front driver side of the vehicle shearing off the front of the vehicle and leaving molten slag holes in the body of the truck. *Id.* Further, SSG Smith explains that the area was a very well-known location of EFP strikes and in fact was performing the mission to find the network of personnel emplacing EFPs in the area. *Id.* Plaintiffs' expert found that the description of the event was consistent with EFP attack. Exhibit 1, Thompson Report at 14-15.

Mr. Smith suffers from TBI, Tinnitus, PTSD, essential tremors, memory loss and has to under speech therapy. Exhibit 6 at 10-15. VA rated him 100% rating for PTSD. *Id.* Due to the symptoms, he had difficulty maintaining employment, and managing personal affairs, including his relationships with the loved ones. *Id.*

**vi.   The May, 2007 EFP Attack on Bobby Wilson, Jr.**

Bobby Wilson, Jr. was a Sergeant First Class in the U.S. Army serving in Iraq from 2007-2008 as a Military Transition Team member training Iraqi soldiers. Exhibit 7, Wilson Dep. at 3-4. On 7th or 6th May, 2007, during Military Transition Team operations the convoy was traveling at a high rate of speed, approximately 60-80 Kilometers Northeast of Baghdad in Diyala Province. *Id.* at 5-9. An attack occurred at a point between the first and second vehicle missing both vehicles, yet leaving a big crater and a blast strong enough to cause Mr. Wilson to hit his head on the windshield. *Id.* at 9-13. The lead vehicle experienced some damage to its rear and the second vehicle experienced some damage to its front. *Id.*   Mr. Wilson was familiar with EFPs and suspected it was an EFP which fortunately failed to directly hit both vehicles. *Id.* at . 9-10.

Plaintiffs' expert analyzed the attack as follows. This event was most likely an EFP event that was poorly aimed by the emplacer. Exhibit 1, Thompson Report at 7. The munition was triggered by the first vehicle, but due to its speed, the blast occurred predominantly behind the first vehicle. *Id.* The splayed shards from the EFP would have caused some minor damage to the rear of the vehicle as was experienced. *Id.* The second vehicle, due to not being properly spaced, experienced some blast results, and experienced relatively minor damage as well. *Id.* The location, date of attack, and fact that the main slug missed the vehicle are indicative of the fact that during this timeframe, the enemy were still trying to optimize their techniques. *Id.* It is because of misses like these, that the enemy ultimately employed multiple array EFP's and changed the angles of attack in future attacks. *Id.*

Mr. Wilson suffers from traumatic brain injury due to the attack, causing intermittent and chronic headache. Exhibit 7, Wilson Dep. at 13-14] He also suffers from PTSD against loud noises. Injuries have negatively affected his social and family relationships. *Id.* at 15-16

**vii. The October 12, 2005 EFP Attack on Nicholas L. McCoy**

Nicholas McCoy was a Private First Class in the 172nd Striker Brigade for the U.S. Army

while serving in Iraq. Exhibit 8, McCoy Dep. at 4.   Mr. McCoy was on a return convoy from Camp Rawal to FOB Marez, precisely passenger seat of the third to last vehicle in 12-20 vehicles convoy, when he was struck by EFP. *Id.* at 4-7. The explosion occurred directly in front of his position in the second to last vehicle in the convoy hitting a trailer. *Id.* Damage to the trailer included a 2-3 feet diameter hole and shrapnel holes. *Id.* at 8-10. Plaintiff's expert confirmed that characteristics of the attack was consistent with the EFP strike. Exhibit 1, Thompson Report at 11. As a result of the blast Mr. McCoy suffers from severe PTSD.   Exhibit 8, McCoy Dep. at 11-12.

**viii. The August 26, 2006 EFP Attack on Michael Fissler.**

On August 26, 2006, Staff Sergeant Michael Fissler was the convoy commander of an 828th Transportation Battalion supply convoy in the vicinity of Q-West to the South of Mosul. Exhibit 9, Fissler Dep. at 5. The convoy was conducting a routine supply run in an Up-Armored Humvee through a known IED/EFP hotspot. An EFP exploded under Plaintiff Fissler's Humvee and the vehicle was lifted several feet into the air and thrown into a ditch. The vehicle received slag penetration holes, a signature mark of the EFP. Fissler, along with the other three servicemen in the vehicle, was seriously injured. Id. at 7.

After reviewing Fissler's depositions and several photos of the incident, EFP expert Ryan E. Thompson concluded Fissler's event was more likely than not caused by an EFP. His report stated in part,   "The type of damage, location of the incident, and timeframe of the attack are all consistent with an EFP strike. The characteristics of an EFP blast include a hole created by a copper plate which is formed into a penetrating slug capable of piercing armor and many smaller holes caused by shards of copper and other shrapnel generated by the blast." Exhibit 1, Thompson Report at 12

Fissler's injuries include a serious neck injury that kept him in a neck brace until he was transported out of Iraq in Oct 2006. Ex. 9, Fissler Dep. at 12.   Plaintiff also suffered PTSD that

has required treatment such as prolonged therapy and medication. Id. at 9. His PTSD seriously shackles his life even today. Id. at 10.

### ix. The July 20th, 2005 EFP Attack on Dylan Hibbert.

In 2005, Dylan Hibbert was a Combat Engineer for the 648th Engineering Battalion. Exhibit 10, Hibbert Dep. at 4. Plaintiff operated a military vehicle known as the Buffalo that was used to locate IED/EFPs.   On July 20th, 2005, Plaintiff was tasked to man the Buffalo with his crew to investigate a potential IED/EFP that was blocking a route used by other military personnel. Id. at 7. While investigating the roadway, a large explosion hit his vehicle causing serious damage. Id. at 10. Shrapnel from the explosion penetrated the hull of the Buffalo. Plaintiff was thrown to the floor of the vehicle and suffered a TBI. Id. at 14. Plaintiff still has neck and back problems to this day along with persistent headaches. He takes a prescription medicine, Zomig for his headaches. Id. at 17.

Although plaintiff is a combat engineer and felt confident the attack on July 20th, 2005 was an EFP attack, we had an expert (a third party combat engineer) review Plaintiff's case and he stated in part, "This is most likely an EFP. Due to the fact that Mr. Hibbert is a combat engineer and performed route clearance missions, he is very knowledgeable of the types of IEDs and EFPs used in theater. The timeframe of the event is consistent with an EFP. Further, the buffalo interrogation vehicle is designed to resist explosive blasts and is heavily armored with a vee shaped hull. The fact that this event penetrated the hull is indicative of an EFP. The characteristics of an EFP blast include a hole created by a copper plate which is formed into a penetrating slug capable of piercing armor and many smaller holes caused by shards of copper and other shrapnel generated by the blast." Exhibit 1, Thompson Rep. at 16.

### x. The April 24, 2005 EFP Attack upon Nicholas McCarty.

26

In April of 2005, Nicholas McCarty was an infantryman for Charlie Company in the 14th Infantry.   Exhibit 11, McCarty Dep. at 4. On April 24th, 2005, Plaintiff was on a routine combat patrol providing overwatch of a local market. At the conclusion of the patrol, the Up-Armored Humvee Plaintiff was in backed up to retrieve signage and equipment when a detonation occurred. Shrapnel from the EFP penetrated the Humvee in many locations. Id. at 10. Review of Plaintiff's testimony and photos provided by Plaintiff led to the following statement from our expert, "This is an EFP. EFP's were in use in the theater of operations during this timeframe. The characteristics of an EFP blast include a hole created by a copper plate which is formed into a penetrating slug capable of piercing armor and many smaller holes caused by shards of copper and other shrapnel generated by the blast." Exhibit 1, Thompson Report at 17.

Due to the EFP that detonated under Plaintiff's vehicle, he had shrapnel penetrate his knees and arm leaving scars. Most of which has been removed but a piece of shrapnel remains in his left knee. Exhibit 11 at 13. To this day, Plaintiff suffers pain in his knees making it difficult to walk. The explosion also resulted in Tinnitus in his ears. *Id.* at 14.

**xi. The April, 2006 EFP Attack on Jason Harrison.**

In April of 2006, Plaintiff Jason Harrison was stationed in Ramadi, Iraq with Alpha Task Force.   Exhibit 12, Harrison dep. Plaintiff was tasked with utilizing a Bradley Fighting Vehicle to find and secure a key enemy person, known as a High Value Target (HVT). *Id.* at 5. After successfully executing the combat objective, his vehicle was struck by a device which penetrated the armor. The explosion was so severe that the next event plaintiff recalls is waking up in a military hospital in Germany. Id. at 6. Upon reviewing this case with his expertise as a Combat Engineer, Ryan Thompson entered this in his report, "This is most likely an EFP. EFP's were specifically used to target armored vehicles, such as Bradley Fighting vehicles. The timeframe of the attack, type of damage, and tactical placement of the device during a highly kinetic mission is

27

consistent with EFP attacks." Exhibit 1, Thompson Report at 8.

When Plaintiff awoke in Germany, he was diagnosed with a torn ACL, TBI and post concussive blast syndrome. Exhibit 11, Harrison Dep. at 8. Despite three knee surgeries, he still suffers knee pain. Id. at 10. Due to the injuries plaintiff sustained from the blast he still visits the VA to be seen by a neurologist, a psychologist and an orthopedic specialist. Id. at 11.

**b. The November 17, 2007 rocket attack on Rustimayah Base was committed with the aid of material support and resources from Iran.**

Expert Phillip Smyth confirms that the November 17, 2007 attack on Rustimayah Base was conducted with the material support of Iran stating:

> The November 17, 2007 rocket attack discussed during the deposition clearly refers to an IRAM strike on the Rustimayah Base. Kata'ib Hizballah, a group under the direct control of the Islamic Republic of Iran and their IRGC-QF claimed an attack on the base using a specialized IRAM device named the al-Ashtar Rocket. In fact, this was one of the first publicly claimed operations by Kata'ib Hizballah when using this device.   On November 17-18, 2007 two attacks on Al-Shaab and Al-Rustimayah were claimed as demonstrations of the new weapon's capability.   From January 1, 2007-December 1, 2007 Kata'ib Hizballah listed 25 attacks against Rustimayah. This would make the site one of the most popular sites for Kata'ib Hizballah to bombard in 2007.   Thus within a reasonable degree of certainty based on my knowledge and expertise, it is my opinion that this attack was committed with Iranian support, inspiration, and funding.

Exhibit 2, Smyth Report at 11-12.

**i. The November 17, 2007 rocket attack on Shaun Cook.**

Shaun Cook was a Sergeant with the 92nd Engineers serving in the U.S. Army during three tours in Iraq.   Exhibit 13, Cook Dep. at 4-5.   Mr. Cook was injured during the Camp Rustamiyah bombing, on the morning of 17 November 2007. *Id.* at 20-21. Plaintiffs' expert verified Mr. Cook's account, and also confirmed that Kata'ib Hizballah was associated with the attack, with Iranian support. Exhibit 2, Smyth Rep. at 11-12.

Mr. Cook suffers from severe PTSD, debilitating everyday functions, and social

connection. Exhibit 13, Cook Dep., at 14-15. He received 100% disability rating from the army and could not hold on to an employment for a long time. It has also significantly damaged his romantic relationships. *Id.* at 16-17.

**c. The July 2011 rocket attacks on Camp Victory were committed with the aid of material support and resources from Iran.**

Expert Phillip Smyth explains that during the 2010-2011 period, Kata'ib Hizballah claimed a number of attacks on Camp Victory and the Baghdad Green Zone. Exhibit 2, Smyth Report at 12. As Mr. Smyth explained, "Camp Victory, near Baghdad Airport was a favored target for Kata'ib Hizballah and Asa'ib Ahl al-Haq. *Id.* In fact, Iranian-backed Iraqi Shia militia forces drastically upped their attacks against U.S. forces during the 2010-2011 pullout period." *Id.*

**i. July 2011 rocket attack on Frieda Catherine Nicole**

Fried Nicole is a U.S. Citizen who worked in Iraq for DynCorp, a contractor for the U.S. Government in 2011. Exhibit 14, Nicole Dep. at 3-5. Ms. Nicole was living in a tent in Camp Victory when she was injured as the camp underwent a prolonged rocket and IED attack in July 2011. *Id.* at 5-8. Smyth opines that this attack was from Kata'ib Hizballah, which operated with the material support of Iran, and claimed several attacks on Baghdad area during the period she was attacked. Exhibit 2, Smith Report. at 12. Smyth Decl. at 12.

Ms. Nicole suffered a painful ankle injury which required her to undergo surgery to replace her ankle and Achilles tendon and still limits her mobility. Exhibit 14, Nicole Dep. at 5. She also suffers from short term memory loss and depression. *Id.* at 19-20.

**d. The March 19ᵗʰ   2013 IED Attacks in Bagram, Afghanistan were committed with the aid of material support and resources from Iran.**

As Phillip Smyth explained, Iran has been paying bounties to the Taliban for the deaths of U.S. soldiers particularly in the Bagram, Afghanistan area. Exhibit 2, Smyth Report at 9. "As late as December 2020, sources related to the U.S. Department of Defense told CNN that the Islamic Republic of Iran was engaged in paying bounties to local Taliban factions and elements linked to the al-Qa'ida and Taliban affiliated Haqqani Network.   Attacks associated with these bounties can be assessed to include IED and EFP, small arms, and rocket attacks, based on the variety of attacks that have occurred in the area since 2003." *Id.* As stated above by 2013 Iran was providing significant financial and material support in terms of weapons as well as incentives to kill Americans through providing bounties.   *See Supra* at Section V(D); *see also    infra* Section VI(A)(2)(e)

### i. The March 19, 2013 IED Attack on Joseph James III

Joseph James III was a Sergeant in the U.S. Army Serving in Afghanistan with the 359 Transportation Unit for his fourth tour of duty in 2012-2013. Exhibit 15, James Dep. at 4-5. On March 19, 2013 he was an assistant convoy commander for gun truck unit when his truck was attacked on his way back to Bagram from Kandahar. *Id.* at 6-7. His car flipped over due to the explosion. *Id,* at 10. Mr. James suffered from laceration to his face, deviated septum, deterioration of two back disks, laceration on his leg, and a traumatic brain injury.   *Id.* at 13-15.   Lacerations both left lasting scars. *Id.* He also continuously suffers migraines, and from back injuries as well. *Id.* Traumatic injury has caused mood swings, sensitivity, depression, and chronic migraine. Memory loss came as well. *Id.* at 14-15**.** He was also diagnosed with PTSD. *Id*. at 15.

### e. The January 4, 2016 VBIED Attack on Camp Sullivan in Afghanistan were committed with the aid of material support and resources from Iran.

Beginning in 2006, the United States government began recording numerous instances of Iranian state-sanctioned arms transfers directly to the Taliban. Notably included among the materials provided were "plastic explosives." Exhibit 2, Smyth Report Ex. A at ¶ 27. Assembling

the materials needed to create a 3,000-pound explosive device is not a simple proposition, particularly under the scrutiny of the United States military. Iran's willingness to provide the Taliban with whatever they needed Plaintiffs' expert agrees, stating that "[t]he size, manner, and location of the Camp Sullivan attack suggest it was more likely than not carried out by the Taliban." *Id.* at ¶¶ 15, 57. The Taliban claimed responsibility for the Camp Sullivan Attack that same day via the Twitter account of their official spokesman. *Id.* at ¶¶ 16–18; Ex. 2 at ¶ 22; needed, so long as the targets were Americans, was a substantial factor in the Taliban's capability to execute a large explosive attack such as the Camp Sullivan Attack. In 2015, Iran stepped up its commitment to the Taliban, including the creation of two specialized training camps for the express purpose of educating the Taliban's best fighters in advanced tactics. *Id.* at ¶¶ 41–42. Those advanced tactics included the capability for large vehicle-based explosive devices, also known as VBIEDs, the same type of device used in the Camp Sullivan Attack. *Id.* In exchange for this training, the Taliban agreed to use these new tactics primarily for attacking American and NATO interests. *Id.* This reported behavior is consistent with historical Iranian tactics when training other proxy groups, such as Lebanese Hizballah, al-Qaeda, Hamas, and Palestinian Islamic Jihad, in the use of VBIEDs. *See id.* at ¶¶ 34–40.

Iran's financial assistance to the Taliban was both direct and indirect. Iran has maintained a bounty system for Taliban fighters through which it pays "$1,000 per killed U.S. serviceman and $6,000 for each destroyed U.S. vehicle."*Id.* at ¶ 55. More sizably, albeit less directly, Iran also provides financial assistance to the Taliban by enabling the narcotics trade. Official Iranian military operations were used to allow Afghan narcotics traffickers to smuggle opiates through Iran for the purpose of funding acts of terrorism. See *Id.* at ¶ 50. These schemes allowed the Taliban to profit from its narcotics cultivation and trade on a scale not otherwise possible without state-sponsored assistance. Beyond these direct instances of support, Iran's longstanding support

31

of terrorism through encouragement of VBIEDs as a means of attack is also a substantial factor in this case. Iran purposefully teaches these tactics to its proxies as a way to show strength and communicate to its opponents that it is capable of influencing the security status in the area. *Id.* at ¶¶ 32–33. Smyth describes VBIEDs as a "hallmark" of Iran's proxy warfare and shows how the Camp Sullivan Attack bore similarities to a variety of infamous assaults carried out by known Iranian proxies. *Id*. at ¶¶ 34–36.

At the time it was carried out, the Camp Sullivan Attack was the second largest bombing executed in the Afghan capital of Kabul. *Id.* at ¶ 33. This scale of attack requires access to explosive materials, fighters trained in both the construction of such a large explosive and the coordination of a large-scale attack, as well as the financial resources to execute it. Iran has provided all three components to the Taliban and was doing so long before January 2016. Iranian support to the Taliban drastically increased in the months leading up to the Camp Sullivan Attack, a period which represented "the critical juncture in Iran's shift with the Taliban." *Id*. at ¶ 41. All told, Iran's vast and varied support was a substantial factor in the Taliban's successful execution of the Camp Sullivan Attack. *Id*. at ¶ 64.

### i. The January 4, 2016 VBIED attack on Randall Burns at Camp Sullivan

Randall Burns was working as a U.S. Embassy security manager in Kabul, Afghanistan and was located in civilian hotel next to Camp Sullivan. Decl. of Randall Burns at ¶ 2. During a meeting on January 4, 2016, a VBIED detonated at the entrance of Camp Sullivan knocking Mr. Burns against the wall and to the floor filling the room with dirt. *Id.* at ¶ 3. l Specialists assessed Mr. Burns' injury as follows: traumatic brain injury, vertigo, post-blast cataract and shrapnel in right eye, PTSD *Id.* at ¶ 6. Due to the shrapnel and cataract in his eye, he had to have two surgeries with permanent loss of right eyesight. *Id.* at ¶ 7. Traumatic brain injury and vertigo demanded years of physical therapy. *Id.* Along came memory loss, chronic vertigo, repeated loss of hearing and

constant tinnitus in ears, and various PTSD symptoms causing social and career isolation. *Id.*

**3. *The Victim Plaintiffs all suffered personal injuries due to the EFP/IED Attacks.***

As stated above each of the Plaintiffs have provided evidence of physical and emotional injuries. Such uncontroverted testimony is sufficient to establish the existence of personal injuries necessary to satisfy this final element. *See Ewan*, 2020 WL 3081939, at *2 (explaining that "sworn affidavits or declarations" may be sufficient to satisfy the evidentiary burden on default). If the Court grants this Motion as to liability, or requires a full evidentiary hearing, Plaintiffs are prepared to fully detail the extent of these injuries, and to support these claims with medical documentation and expert medical testimony to prove the extent of each Plaintiffs' injuries.

In sum, the Victim Plaintiffs have shown all the necessary elements to establish a waiver of Iran's sovereign immunity for a suit arising out of the EFP/IED Attacks. Namely, that (1) Iran is a designated state sponsor of terrorism, *see supra*; (2) the Plaintiffs and Decedents were serving as employees of the United States at the time of the EFP/IED Attacks, *see supra*; and (3) Iran's material support to Iraqi Shia militias and Afghanistan terrorist militia was a proximate cause of the injuries sustained in the EFP/IED Attacks, *see supra* Part IV.A.ii. Accordingly, this Court should find that Iran has forfeited any claim to sovereign immunity and that this Court may exercise subject matter jurisdiction over the claims asserted herein.

**B. Personal Jurisdiction**

Federal district courts may exercise personal jurisdiction over a foreign state when: (1) the court has subject matter jurisdiction; and (2) the defendant is properly served pursuant to 28 U.S.C. § 1608. *See* 28 U.S.C. § 1330(b). The preceding section shows the basis for satisfying the first element, this Court's subject matter jurisdiction, and proper service was obtained as is described below, thereby satisfying the second element for personal jurisdiction.

Title 28, Section 1608 prescribes the four methods of obtaining proper service in FSIA cases. *See* 28 U.S.C. § 1608(a)(1)–(4). These methods must be attempted in ascending order, but only to the extent that each is feasible in a specific case or applicable to a specific defendant. *Id*. The first two methods of service under Section 1608—a "special arrangement for service between the plaintiff and foreign state" and "in accordance with applicable international convention," respectively—do not apply here, as Plaintiffs have no "special arrangement" for service with Iran, and Iran is not a party to "any applicable international convention on service of judicial documents." *See Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52, 70 (D.D.C. 2010); *Schwartz v. Islamic Republic of Iran*, Case No. 1:18cv1349, 2020 WL 7042842, at *15 (D.D.C. Nov. 30, 2020).

Plaintiffs initiated the third method of service, via foreign mailing pursuant to 28 U.S.C. § 1608(a)(3), on October 2, 2019. ECF No. 7. The Clerk's office was unable to effect service in this manner. After waiting the requisite thirty days, Plaintiffs initiated the final method of service, in accordance with 28 USC § 1608(a)(4), on November 19, 2019. ECF No. 12. On November 21, 2019, the Clerk transmitted those documents to the State Department for service through diplomatic channels. *See* ECF No. 13.   The State Department confirmed that the Iranian Ministry of Foreign Affairs was served with the pleadings on January 22, 2020. ECF No. 14.

Iran is outside the protection of sovereign immunity, *see supra* Section VI.A, and, as explained in this section, Plaintiffs have fully complied with the service requirements of Section 1608(a). Therefore, this Court may properly exercise personal jurisdiction over Iran in this matter. *See* 28 USC § 1330(b).

**VII. LIABILITY**

The National Defense Authorization Act in 2008 was enacted to explicitly authorize a federal cause of action for Plaintiffs and Decedents' family members under the FSIA.   *Fritz,* 320

F.Supp.3d at 89, *citing Owens,* 864 F.3d at 807–09.    "There is almost total 'overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity."' *Fritz,* 320 F.Supp.3d at 86–87, *quoting Foley v. Syrian Arab Republic,* 249 F.Supp.3d 186, 205 (D.D.C. 2017). A plaintiff who proves the waiver requirements of 28 U.S.C. § 1605A(a) and is a U.S. national, military member or government contractor at the time of the terrorist act, "has also established entitlement to relief as a matter of federal law." *Fritz,* 320 F.Supp.3d at 87. Put differently, for the Victim Plaintiffs, "the elements of immunity and liability … are essentially the same." *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 54 (D.D.C. 2018) (quoting *Kilburn v. Islamic Republic of Iran*, 699 F.Supp.2d 136, 155 (D.D.C. 2010)).

Those 1605A elements—that Iran was designated as a state sponsor of terrorism; that the Plaintiffs and/or Decedents were performing a contract for the United States and acting within the scope of their employment; that money damages are being sought for personal injuries caused by attempted acts of extrajudicial killing, or the material support of such acts—are the same under both the sovereign immunity waiver and the liability aspects of the statute. *See id.*; *see also* 28 U.S.C. § 1605A(c). Accordingly, the Victim Plaintiffs are entitled to federal statutory liability as a matter of law for the reasons above. See *supra*.

If liability is found than the Court "may appoint special masters to hear damage claims brought under this section." 28 U.S.C.A. § 1605A(e). Section 1605A(c) provides that plaintiffs, heirs-at-law, representatives and beneficiaries of the decedent's estate are entitled to recover damages that "may include economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C.A. § 1605A; *see Colvin v. Syrian Arab Republic*, 363 F.Supp.3d 141, 161(D.D.C. 2019) (sister of decedent entitled to solation and wrongful death damages).

## VIII. CONCLUSION

Iran purposefully manufactured EFPs, IRAMs and other IEDS distributed them into Iraq and Afghanistan, and trained militias in their use, all for the express purpose of maximizing American casualties. The case before the Court is squarely in line with the policy and purpose behind the FSIA's terrorism exception. Accordingly, Plaintiffs seek justice from this Court through a finding of liability against Iran for the successful and attempted extrajudicial killings of the Plaintiffs and Decedents.

WHEREFORE, Plaintiffs request that the Court issue an Order GRANTING their Motion for Default Judgment against Iran as to liability and directing Plaintiffs submit a Status Report within fourteen (14) days containing at least one recommendation for a qualified individual to serve as a special master for the hearing of evidence as to damages.

Dated: July 12, 2021                           Respectfully submitted,


                                               /s/ Michael J. Miller
                                               Michael J. Miller, Esq.
                                               D.C. Bar No. 397689
                                               Jeffrey A. Travers (*pro hac vice*).
                                               The Miller Firm LLC
                                               108 Railroad Avenue
                                               Orange, VA 22960
                                               Tel: (540) 672-4224

                                               **Attorney for Plaintiffs**